1 | SAMUEL E. BONDEROFF (SB-1591) (*pending pro hac vice*)
samuel@zamansky.com
2 | JACOB H. ZAMANSKY (JZ-1999) (*pending pro hac vice*)
jake@zamansky.com
3 | EDWARD H. GLENN JR. (EG-0042) (*pending pro hac vice*)
eglenn@zamansky.com
4 | ZAMANSKY LLC
50 Broadway, 32nd Floor
5 | New York, NY 10004
Telephone: 212/742-1414
6 | Facsimile: 212/742-1177

7 | ***Counsel for Plaintiff***

8 | Michael L. Kirby (50895)
mkirby@knlh.com
9 | KIRBY NOONAN LANCE & HOGE LLP
350 Tenth Avenue, Suite 1300
10 | San Diego, CA 92101-8700
Telephone: 619/231-8666
11 | Facsimile: 619/231-9593

12 | ***Local Counsel for Plaintiff***

13 |
**UNITED STATES DISTRICT COURT**
14 | **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

15 | JACK WILSON, WILLIAM GAUDETTE and    Case No.:
16 | all other individuals similarly situated,

  **CLASS ACTION**
17 |         Plaintiffs,   **COMPLAINT FOR**
  **VIOLATIONS OF THE**
18 |   **EMPLOYEE RETIREMENT**
        v.   **SECURITY ACT**
19 | FIDELITY MANAGEMENT TRUST
20 | COMPANY, THE INVESTMENT AND
ADMINISTRATIVE COMMITTEE OF THE
21 | WALT DISNEY COMPANY SPONSORED   <u>JURY TRIAL DEMANDED</u>
22 | QUALIFIED BENEFIT PLANS AND
KEY EMPLOYEES DEFERRED
23 | COMPENSATION AND RETIREMENT
24 | PLAN, CHRISTINE M. McCARTHY,
JAMES A. RASULO, ALAN N.
25 | BRAVERMAN, MARY JAYNE PARKER,
26 | and JEFFREY E. SHAPIRO,

27 |         Defendants.
28 |

KNLH\1492562.1

CLASS ACTION COMPLAINT

1       Plaintiffs Jack Wilson and William Gaudette ("Plaintiffs"), by and through

2     their attorneys, file this Complaint on behalf of themselves and other similarly

3     situated current and former employees of The Walt Disney Company ("Disney" or

4     the "Company"), or its predecessor companies, who were participants in and

5     beneficiaries of the Disney Savings and Investment Plan and Disney Hourly Savings

6     and Investment Plan (together, the "Plan") and who were invested in the Sequoia

7     Fund (the "Sequoia Fund" or the "Fund") from March 31, 2015 to the present,

8     inclusive (the "Class Period"). They allege the following based on the investigation

9     of counsel, which included a review of the Plan's governing documents; the Plan's

10    annual reports filed with the United States Securities and Exchange Commission

11    ("SEC") and U.S. Department of Labor; discussions with Plan participants; SEC

12    filings by Disney; SEC filings by the Sequoia Fund; other lawsuits against the

13    Sequoia Fund; press releases and other public statements and media reports about

14    the Sequoia Fund and its underlying investments. Plaintiffs believe that substantial

15    additional evidentiary support exists and will emerge for the allegations set forth

16    herein after there has been a reasonable opportunity for discovery.

17       1.    This is a class action brought pursuant to Section 502 of the Employee

18    Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132, on behalf of

19    participants in the Plan who purchased or held shares of the Sequoia Fund, against

20    defendant Fidelity Management Trust Company ("Fidelity"), as well as the

21    members of the Investment and Administrative Committee of the Walt Disney

22    Company Sponsored Qualified Benefit Plans and Key Employees Deferred

23    Compensation and Retirement Plan (the "Committee"), all fiduciaries of the Plan, to

24    recover many millions of dollars of damage suffered in their retirement accounts

25    during the Class Period due to breaches of the fiduciary duties owed to them under

26    ERISA.

27       2.    Defendant Fidelity, which was the Trustee and Investment Manager of

28    the Plan, was a designated fiduciary of the Plan, its fiduciary duties delegated to it

1  by the Plan's administrator, a committee of Disney officers appointed under the
2  Plan's governing document.  Fidelity was well compensated for its execution of
3  fiduciary duties for the Plan as Trustee and Investment Manager, among other
4  services it provided.

5      3.    Fidelity breached its fiduciary duty to properly monitor the Sequoia
6  Fund, and by continuing to offer it as an investment option after it had become an
7  imprudent investment for the Disney employees' retirement savings, without
8  warning or notifying them.  The fiduciary duties owed under ERISA are the "highest
9  known to the law."  Fidelity's breaches resulted in many millions of dollars of losses
10  to retirement savings under the Plan.

11      4.    Disney, through its subsidiaries, operates a diversified worldwide
12  entertainment company.   Its businesses include operating radio and television
13  broadcast networks, television programming and distribution, motion picture
14  production and distribution, operating theme parks and resorts, and licensing and
15  merchandising its trade names, characters and visual and literary properties. Disney
16  has approximately 185,000 employees around the world in its various businesses.

17      5.    The Plan is a defined contribution plan sponsored by Disney for
18  eligible employees and former employees of the Company.  One of the investment
19  options made available by Fidelity for investment by the Plan participants is and
20  was the Sequoia Fund. In fact, the Sequoia Fund, which is an open-end mutual fund
21  and trades under the ticker symbol "SEQUX," is a well-known "value-oriented"
22  fund that was one of the Plan's most popular investment options and largest
23  holdings.

24      6.    Fidelity breached its fiduciary duties to the Plan participants by failing
25  to properly monitor and/or continuing to offer and invest in the Sequoia Fund after it
26  had become an imprudent investment under ERISA, without providing disclosure or
27  warning to the Plan participants.  By March 31, 2015, at the start of the Class
28  Period, the Sequoia Fund had deviated from sound investment principles and was in

1  open violation of its own stated investment policies, as set forth in its Prospectus,
2  Registration Statement and Statement of Additional Information filed publicly with
3  the SEC.

4      7.    Its Prospectus states that the Sequoia Fund will invest in stocks "when
5  the price appears low in relation to the value of the total enterprise" and "typically
6  sells the equity security of a company when the company shows deteriorating
7  fundamentals, its earnings progress falls short of the investment adviser's
8  expectations or its valuation appears excessive relative to its expected future
9  earnings" (the "Sell Strategy").

10     8.    The Sequoia Fund deviated from the Sell Strategy because it
11  maintained a heavily concentrated position in Valeant Pharmaceuticals
12  International, Inc. (Ticker: VRX) ("Valeant"), even though Valeant was trading at
13  widely inflated levels. At its peak of over $263 per share in August 2015, Valeant
14  was trading close to 100 times its 2014 earnings.

15     9.    Valeant represented about 32% of the Sequoia Fund's net assets and
16  about 36% of its stock holdings at its August 2015 peak. The Fund's concentration
17  in Valeant violated the Sell Strategy set forth in its public SEC filings and its
18  purported value-oriented investment strategy. The Valeant concentration also
19  violated basic norms of prudent investing and incurred speculative risks that made it
20  completely inappropriate for retirement savings.

21     10.   In addition, the Sequoia Fund had adopted a concentration policy (the
22  "Concentration Policy") that could only be changed by a vote of the shareholders.
23  Pursuant to Sequoia's own Registration Statement and Sections 8(b) & 13(a) of the
24  Investment Company Act of 1940 (the "Investment Company Act" or the "1940
25  Act"), 15 U.S.C. §§80a-8(b) & 13(a) 1, the Sequoia Fund's compliance with its
26  stated Concentration Policy is mandatory.   Section 13(a) of the Investment
27  Company Act expressly states that a registered investment company (such as
28

Sequoia) may not "deviate from its policy in respect of concentration of investments in any particular industry or group of industries...."

11. The Sequoia Fund's Valeant position resulted in a violation of the Fund's mandatory Concentration Policy, which prohibits the Fund from investing 25% or more of the value of the total assets of the Fund in any particular industry. Contrary to the Concentration Policy, the Fund's Valeant holdings alone exceeded 25% of its net assets at the close of the quarters ended March 31, 2015, and June 30, 2015.

12. Additionally, the Fund's investment in "Healthcare" stocks constituted over 25% of its net assets, due principally to the Fund's heavily concentrated position in Valeant (which the Fund classifies as a "Healthcare" stock). For instance, the Fund held stock in the following percentages that violated the Concentration Policy: (1) on March 31, 2015, the Fund held 27.3% of its net assets in Healthcare stocks, with Valeant alone comprising 26% of the Fund's net assets; (2) on June 30, 2015, the Fund held 30% of its net assets in Healthcare stocks, with Valeant alone comprising 28.7% of the Fund's net assets; and (3) on September 30, 2015, the Fund held 26% of its net assets in Healthcare stocks, with Valeant alone constituting 24.8% of the Fund's net assets.

13. The Fund's deviation from the Sell Strategy and Concentration Policy, and its abandonment of prudent investment behavior through its heavy concentration in Valeant, caused the Fund to lose over $2 billion dollars when Valeant's stock price sustained a substantial decline in value, starting in or around the end of September 2015.

14. Two of the Sequoia Fund's four purportedly independent directors abruptly resigned in October 2015, in a very public manner, due to their long-standing disagreement over the Fund's huge bet on, and continued holding of, Valeant stock.

15. While Valeant's stock price was soaring to its August 2015 peak of nearly 100 times GAAP earnings for the previous year, Valeant was being showered with a relentless barrage of public criticism, from investment luminaries such as Charles Munger to politicians including presidential hopeful Bernie Sanders.

16. The thrust of the public criticism related to Valeant's highly controversial practice of drastically slashing the research and development costs of its acquired companies and then jacking up drug prices to boost profits. Scathing media editorials railed against Valeant's penchant for buying companies that sold life-saving drugs and then immediately implementing stratospheric price increases; in one case, raising the cost of a heart medication by 525%.

17. The Sequoia Fund's concentration in Valeant was all the more reckless considering that the embattled company was constantly immersed in controversy for its extremely aggressive drug pricing, voracious appetite for acquisitions, murky financials, and high debt levels. Thus, Valeant's stock price crash, and the resulting loss for the Sequoia Fund, was highly foreseeable to a prudent fiduciary.

18. In short, the Fund's enormous stake in Valeant was a highly speculative long-shot bet which represented a complete departure from the Fund's value-oriented investment strategy and sound investment principles. The Fund's Valeant position also violated the investment strategy disclosed in its public SEC filings.

19. During the Class Period, Fidelity had the fiduciary responsibility and duty under the Plan to monitor and review the Sequoia Fund to ensure its prudence as an investment—and was well-compensated for doing so. Fidelity also had the fiduciary responsibility and duty to ensure that all investment information and communications about Sequoia Fund to the Plan participants were truthful and accurate.

20. Had Fidelity performed its duties properly, it would have detected that the Sequoia Fund had become an imprudent investment which was not appropriate

1  for its Plan members' retirement savings, and it would have taken appropriate steps
2  to prevent foreseeable harm to the Plan participants.

3      21.    Specifically, Fidelity could have ceased offering the Sequoia Fund as
4  an investment option so that there were no new purchases of the Fund while it
5  remained in violation of its own Sell Strategy and Concentration Policy in its public
6  filings. Fidelity could also have ceased offering the Fund while it held so much of
7  Valeant, a speculative stock not appropriate for a value investor. Alternatively,
8  Fidelity could have recommended to the Committee that the Sequoia Fund be
9  removed as an investment alternative while it remained an imprudent investment.

10      22.    Fidelity had the power and duty to divest the Plan out of the Sequoia
11  Fund, wholly or in substantial part, as soon as it became imprudent. The Plan
12  participants had invested in the Sequoia Fund seeking a value-oriented large cap
13  fund. There are numerous other value-oriented, large cap funds which are publicly
14  available to investors. Fidelity could have mandated the transfer from the Sequoia
15  Fund into another value-oriented fund. The substitution of one similar fund for
16  another is not an unusual occurrence for defined contribution retirement plans, and
17  such an action protects Plan participants without harming the Plan as a whole.

18      23.    Fidelity, which was responsible for providing administrative services to
19  the Plan, should have communicated with Plan participants, giving them notice or
20  warning of the material disclosure that the Sequoia Fund was no longer a prudent
21  investment or that it had deviated from a value-oriented strategy into a far riskier
22  speculative investment strategy. This material disclosure would have given the Plan
23  participants the ability to decide whether to remain in the Sequoia Fund or divest
24  into the other alternative investment options under the Plan. After all, Fidelity was
25  the fiduciary; it was supposed to be the investment expert charged with overseeing
26  and preserving Plan participants' retirement savings. It is not incumbent on Disney
27  employees, who are generally unsophisticated about investments like the Sequoia
28  Fund, to take it upon themselves to pore over the Fund's various SEC filings to

1 | determine whether the Fund is still adhering to the Sell Strategy or complying with
2 | its Concentration Policy. That is what experts like Fidelity are hired—and paid—to
3 | do.

4 | 24.   Likewise, the Committee was also a named fiduciary of the Plan, and
5 | its members (the "Committee Defendants") were responsible for monitoring and
6 | overseeing the efforts by Fidelity in managing and administering Plan investments,
7 | including the Sequoia Fund.   Upon information and belief, Fidelity regularly
8 | reported to the Committee about the status of Plan investments—again, including
9 | the Sequoia Fund. In the course of this reporting, the Committee and the Committee
10 | Defendants were—or at least should have been—presented with information about
11 | the Fund's heavy exposure to Valeant and concomitant decline in value.  Based on
12 | this information, the Committee and the Committee Defendants should have used
13 | their "veto power" to cause Fidelity to take the prophylactic actions described
14 | above—closing the Sequoia Fund so that Plan participants could prevent further
15 | losses and invest in a prudent alternative instead.   When it saw the deteriorating
16 | quality of the Sequoia Fund investment option, and specifically that the Fund has
17 | violated its own investment strategy and policy through its overexposure to Valeant,
18 | the Committee and the Committee Defendants should have reined in Fidelity, even
19 | terminating or replacing it as an investment manager if Fidelity failed to take action
20 | to protect Plan participants from the harm caused by the Sequoia Fund.    The
21 | Committee's and the Committee Defendants' failure to do any of these things
22 | despite its obligation to monitor and oversee Fidelity was a breach of their own
23 | fiduciary duties to Plan participants.

24 | 25.   Defendants did nothing while the Plan and its participants suffered
25 | losses of millions of dollars from inappropriate speculation with their retirement
26 | savings.    These losses were foreseeable and could have been prevented had
27 | defendants performed their duties properly. Their utter failure to take any action,

28 |

7

1  whether because of negligence or ignorance, amounts to a breach of their fiduciary
2  duties.

3  **1. JURISDICTION AND VENUE**

4      26.    This Court has subject matter jurisdiction over this action pursuant to
5  28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

6      27.    Venue is proper in this district pursuant to ERISA § 501 (e)(2),
7  29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or
8  all of the fiduciary breaches for which relief is sought occurred in this district, and
9  the Committee maintains its primary place of business in this district.

10  **2. THE PARTIES**

11      28.    Plaintiff Jack Wilson is a Plan participant within the meaning of
12  ERISA § 3(7), 29 U.S.C. § 1102(7). He is a former employee of Disney who was
13  and continues to be a participant in the Plan. He purchased and held shares of the
14  Sequoia Fund in his Plan retirement savings account during the Class Period.

15      29.    Plaintiff William Gaudette is a Plan participant within the meaning of
16  ERISA § 3(7), 29 U.S.C. § 1102(7). He is a former employee of Disney who was
17  and continues to be a participant in the Plan. He purchased and held shares of the
18  Sequoia Fund in his Plan retirement savings account during the Class Period.

19      30.    Defendant Fidelity Management Trust Company ("Fidelity") is a large
20  financial services company which provides trust, investment management,
21  brokerage and custodial services to institutional and retail investors. At all relevant
22  times, Fidelity was the trustee and investment manager of the Plan. Fidelity was
23  also a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A)
24  because it had discretionary authority and control regarding the management of the
25  Plan and the Plan's assets, through its corporate officers.

26      31.    Defendant the Committee has its headquarters in Burbank, California
27  and is both the designated Plan fiduciary and administrator according to the Disney
28  Savings and Investment Plan, As Amended and Restated Effective January 1, 2010

(the "Plan Document"). Under Section 9.01 of the Plan Document, the Committee is made up of Disney's senior officers, including its Chief Financial Officer, General Counsel, Treasurer, Vice President of Human Resources, Vice President of Compensation and Benefits and certain other officers. The Committee was a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had discretionary authority and control regarding the management of the Plan and the Plan's assets.

32.     Since on or about June 30, 2015, defendant Christine M. McCarthy has been the Chief Financial Officer of Disney, as well as a member of the Committee and therefore a named fiduciary of the Plan per the Plan Document. Since on or about June 30, 2015, she is and was the Chairman of the Committee. She was a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because she had discretionary authority and control regarding the management of the Plan and the Plan's assets.

33.     From on or about March 1, 2015 through on or about June 30, 2015, defendant James A. Rasulo was the Chief Financial Officer of Disney and the Chairman of the Committee and therefore a named fiduciary of the Plan per the Plan Document. From on or about March 1, 2015 through on or about June 30, 2015, he is and was the Chairman of the Committee. He was a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because he had discretionary authority and control regarding the management of the Plan and the Plan's assets.

34.     At all times, defendant Alan N. Braverman is and was the Vice President and General Counsel of Disney, as well as a member of the Committee and therefore a named fiduciary of the Plan per the Plan Document. He was a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because he had discretionary authority and control regarding the management of the Plan and the Plan's assets.

35.   At all times, defendant Mary Jayne Parker is and was the Vice President and Chief Human Resources Officer of Disney, as well as a member of the Committee and therefore a named fiduciary of the Plan per the Plan Document. She was a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because she had discretionary authority and control regarding the management of the Plan and the Plan's assets.

36.   At all times, defendant Jeffrey A. Shapiro is and was an officer of Disney, as well as a member of the Committee and therefore a named fiduciary of the Plan per the Plan Document. He was a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because he had discretionary authority and control regarding the management of the Plan and the Plan's assets.

37.   Defendants McCarthy, Rasulo, Braverman, Parker and Shapiro are referred to collectively as either the "Committee Defendants."

### 3. THE FIDUCIARY DUTY VIOLATIONS

**A.   The Plan and Its Fiduciaries**

38.   The Plan is a defined contribution plan sponsored by Disney for eligible current and former employees of the Company. According to its 2014 DOL Form 5500, the Plan had approximately 51,000 participants and over $5 billion in total retirement savings.

39.   Among the investment options available to Plan participants is the Sequoia Fund, which was offered as an investment option even after the Fund itself had closed to new investors.

40.   As of December 31, 2014, the Plan held approximately $538 million of shares of the Sequoia Fund, making it one of the largest investments held by Plan participants.

41.   According to the Plan Document, the Committee serves as the Plan's fiduciary and administrator. Section 10.01 of the Plan Document gives the committee the power to enter into a trust agreement with a trustee to manage the

1   Plan's assets on a day-to-day basis, as well as the power to delegate sole
2   responsibility for the investments to an investment manager.

3       42.    Disney's SEC Form 11-K filings of the Plan's annual reports state that:

4           The assets of the Plan are administered under a trust
            agreement between the Company and the Fidelity
5           Management Trust Company ("Fidelity" or the "Trustee").
            Pursuant to the trust agreement, Fidelity executes the day-
6           to-day activities of trust administration.

7       43.    Upon information and belief, Fidelity also serves as the investment
8   manager of the Plan and thus serves in a fiduciary capacity much like the
9   Committee. Under this arrangement, Fidelity has the responsibility and legal duty
10  under ERISA to ensure that the Plan's investments are prudent for the retirement
11  savings of the Plan participants.    This duty requires that Fidelity monitor the
12  investment options regularly and undertake effective reviews of and due diligence
13  concerning the investment options.    This duty also requires that Fidelity
14  communicate material information about the investment options to the Plan
15  participants.

16      44.    At a minimum, Fidelity was required to review the Plan's investment in
17  the   Sequoia Fund to ensure that it complied on the surface with its stated
18  investment strategy in its prospectuses, registration statements and statements of
19  additional information filed with the SEC.

20      45.    Fidelity was also required to provide information on the investment
21  options under the Plan to the participants in Summary Plan Descriptions and other
22  communications, and was required to make sure that the descriptions of the Sequoia
23  Fund they provided were truthful, accurate and not misleading.

24      46.    Under Section 10.03 of the Plan Document, the Committee is
25  responsible for monitoring and overseeing Fidelity in the latter's execution of its
26  fiduciary responsibilities:

27          The Committee shall have the duty to advise any
            investment adviser or person (including any investment
28          manager) with discretionary investment authority over all

1    or a portion of the Plan's Trust Fund of the investment
     objectives which such person should observe. Such advice
2    should, looking at the assets of the Plan as a whole, take
     into account the short-term cash needed for benefit
3    payment as well as the long-term growth needed to
     discharge the Plan's liabilities. The Committee may make
4    such changes in the appointment of the Trustee or any
     investment advisers or investment managers, and may
5    remove or replace the Trustee or any investment adviser or
     investment manager, as it deems advisable. The
6    Committee also shall have the power and authority
     specified in any agreements with the Trustee or any
7    investment adviser or investment manager.

8       47.    Thus, the Committee had the power to advise Fidelity regarding what

9    the latter's "investment objectives" should be. The Committee could also "remove

10   or replace" Fidelity if Fidelity failed to perform up to fiduciary-duty standards.

11   Upon information and belief, Fidelity reported to the Committee regarding its

12   trustee and investment management activities on a regular basis; this reporting

13   included a discussion of the performance of the Sequoia Fund.

14      **B.    The Sequoia Fund's Concentration in Valeant**

15      48.    The Sequoia Fund is an open-end mutual fund under the 1940 Act

16   which has its headquarters at 9 West 57th Street, Suite 5000, New York, New York

17   10019. Since 1970, its investment advisor has been Ruane, Cunniff & Goldfarb,

18   Inc.

19      49.    The Fund was co-founded in 1970 by Richard Cunniff and William

20   Ruane, a friend of Warren Buffett from when the two studied together in the 1950s

21   under the legendary value investor Benjamin Graham at Columbia University.

22   When Mr. Buffett closed his investment partnership in 1969, he advised his clients

23   to invest with Ruane and Cunniff in the Fund.

24      50.    Robert Goldfarb joined Sequoia Adviser in 1971, shortly after its

25   inception. The Fund's other portfolio manager, David Poppe, joined Sequoia

26   Adviser in 1999. Messrs. Goldfarb and Poppe currently serve as the portfolio

27   managers of the Fund and have served in a similar capacity since prior to 2009.

28

1      51.   Since December 2013, the Fund has been closed to new investors

2 (except new investors investing directly with the Fund who are employees or clients

3 of the Sequoia Adviser, and members of their families).  The Fund, however, has

4 remained open to existing shareholders and also continues to reinvest income and

5 capital gains distributions for the accounts of existing shareholders who have elected

6 those options

7      52.   In its most recently filed annual report, the Fund stated that it had over

8 $8 billion in net assets.

9      53.   The Fund is registered under the Investment Company Act, which

10 establishes a comprehensive federal regulatory framework applicable to mutual

11 funds, *see* 15 U.S.C. § 80a-1 *et seq.,* and which provides that a mutual fund's

12 registration statement must recite all investment policies that can be changed only

13 by shareholder vote. 15 U.S.C. § 80a-8(b). These investment policies, changeable

14 only by a shareholder vote, were adopted and subsequently incorporated in the

15 Sequoia Fund's registration statements, prospectuses and statements of additional

16 information (incorporated into its prospectuses).

17      54.   Since at least the mid-1990s, Sequoia has had a strategy of carefully

18 studying each company it considers investing in to appraise its "fundamental value"

19 and purchasing stocks that are undervalued in relation to the value of the total

20 enterprise. The Fund's Prospectus, dated May 1, 2015, states:

21                  The Fund's investment objective is long-term growth of
capital. In pursuing this objective the Fund focuses
22                  principally on common stocks that it believes are
undervalued at the time of purchase and have the potential
23                  for growth. A guiding principle is the consideration of
common stocks as units of ownership of a business and the
24                  purchase of them when the price appears low in relation to
the value of the total enterprise. No weight is given to
25                  technical stock market studies. The balance sheet and
earnings history and prospects of each investment are
26                  extensively studied to appraise fundamental value.

27

28

55.     The Fund's Prospectus also states that the Fund "typically sells the equity security of a company when the company shows deteriorating fundamentals, its earnings progress falls short of the investment adviser's expectations or its valuation appears excessive relative to its expected future earnings."

56.     In addition, the Sequoia Fund has adopted as a fundamental investment policy a Concentration Policy, which can only be changed by a vote of the shareholders.  Pursuant to the Sequoia Fund's Registration Statement and Sections 8(b) & 13(a) of the Investment Company Act, IS U.S.C. §§ 80a-8(b) & 13(a), the Fund's compliance with its stated Concentration Policy is mandatory. Section 13(a) of the Investment Company Act expressly states that a registered investment company (such as the Sequoia Fund) may not "deviate from its policy in respect of concentration of investments in any particular industry or group of industries..."

57.     The Sequoia Fund's Concentration Policy states that:

> The Fund may not: ... Concentrate investments in an industry, as concentration may be defined under the 1940 Act or the rules and regulations thereunder (as such statute, rules or regulations may be amended from time to time) or by guidance regarding, interpretations of, or exemptive orders under, the 1940 Act or the rules or regulations thereunder published by appropriate regulatory authorities.

58.     Form N-IA, which is the registration statement form for open-end mutual funds such as the Sequoia Fund, reflects the SEC's longstanding view that "25% is an appropriate benchmark to gauge the level of investment concentration that could expose investors to additional risk," and thus, "a fund investing more than 25% of its assets in an industry is concentrating in that industry." Accordingly, the Sequoia Fund's Concentration Policy prohibits investment of 25% or more of the value of the total assets of the Fund in any industry.

59.     The Fund's obligations to comply with these stated strategies are only changeable by shareholder vote.   Sections 8(b) and 13(a)(2) and (3) of the

1  Investment Company Act also imposed fiduciary obligations on the Fund's directors
2  and managers to adhere to the Sell Strategy and Concentration Policy.

3      60.    The Sequoia Fund began investing in Valeant in 2010. In its Semi-
4  Annual Report dated June 30, 2010, the Fund disclosed that it had added Valeant to
5  its holdings. As of June 30, 2010, the Sequoia Fund had acquired 3,230,000 shares
6  of Valeant worth $168,896,700, accounting for 5.7% as of the Fund's total net
7  assets.

8      61.    By the next semi-annual reporting period, the Fund had increased its
9  investment in Valeant. According to its Annual Report dated December 31, 2010,
10  the Fund sold nearly half of its holding in its largest investment, Berkshire
11  Hathaway, and invested additional funds in Valeant.

12     62.    As of December 31, 2010, Sequoia had acquired 11,320,000 shares of
13  Valeant valued at $320,242,800, accounting for 9.2% of the Fund's total net assets.

14     63.    Over time, however, Valeant became the Fund's largest holding. As of
15  December 31, 2014, the Fund held 11,281,224 shares of Valeant worth
16  $1,614,455,967, accounting for 20% of the Fund's total net assets. By way of
17  comparison, at that time, the Fund's second largest holding, Berkshire Hathaway,
18  accounted for only 12.9% of the Fund's total net assets.

19     64.    The Sequoia Fund's investment in Valeant radically changed its quality
20  and risk profile as an investment. Berkshire Hathaway and Valeant are at opposite
21  ends of the risk spectrum of equity investments. Owning Berkshire Hathaway is
22  like owning a diversified mutual fund because it acts as a holding company for
23  numerous large businesses and holds positions in a variety of other publicly traded
24  blue chip companies in widely differing industries. Led by the esteemed value
25  investor Warren Buffett, Berkshire Hathaway has a long history of success and has
26  become virtually synonymous with the principles of value investing.

27     65.    Valeant, by contrast, has an extremely aggressive business model,
28  which has been repeatedly criticized by leading financial commentators and

1  investors. Further, Valeant's chief executive, J. Michael Pearson, is notorious for
2  pushing ethical lines in his business practices, drawing public ire and scrutiny upon
3  the company.  Valeant, whose stock price has at times reached stratospheric price-
4  to-earnings ratios, is the antithesis of a value stock.

5         66.    During the Class Period, the Sequoia Fund's position in Valeant grew
6  and remained outsized. As of March 31, 2015, Sequoia held 11,281,224 shares of
7  Valeant worth $2,240,676, 711, accounting for about 26% of the Fund's net assets
8  and about 30% of its stock holdings.

9         67.    As of June 30, 2015, the Sequoia Fund held 11,281,224 shares of
10  Valeant worth $2,506,123,912, accounting for nearly 29% of the Fund's net assets
11  and about 34% of its stock holdings. The Fund's next five largest holdings
12  combined accounted for a smaller percentage of the Fund's total net assets than
13  Valeant alone.

14        68.    The Fund's position in Valeant exceeded about 32% of its net assets
15  and about 35% of its stockholdings when, on August 5, 2015, Valeant's shares hit
16  an all-time closing high of $262.52 per share.  In light of the Fund's extraordinarily
17  heavy concentration in Valeant, the Fund's performance (and volatility) was closely
18  tied to Valeant's fate.

19        69.    As of September 30, 2015, the Sequoia Fund held 11,280,682 shares of
20  Valeant worth $2,012,248,055, accounting for nearly 25% of the Fund's net assets
21  and nearly 29% of its stock holdings.

22        70.    Incredibly, in October 2015, the Sequoia Fund purchased an additional
23  1.5 million shares of Valeant, bringing the total shares of Valeant held by the Fund
24  to over 12.7 million.

25        71.    The Sequoia Fund's heavy concentration in Valeant violated the stated
26  Sell Strategy and Concentration Policy set forth in its prospectuses, registration
27  statements and statements of additional information. The Fund's concentration in
28  Valeant further violated the value-oriented investment strategy and sound principles

Case 2:16-cv-02251-PA-JC   Document 1   Filed 04/01/16   Page 18 of 36   Page ID #:18

1  of investing, and transformed the nature and quality of the risks of it as an
2  investment.

3      72.    Fidelity should have been paying closer attention.  As a prudent
4  fiduciary, Fidelity had an ongoing duty to monitor the Sequoia Fund to ensure that it
5  remained an appropriate investment for Plan participants' retirement savings, and
6  specifically to ensure that the risk associated with the Sequoia Fund was one that
7  was appropriate for Plan participants to take on.  Thus, Fidelity should have been
8  monitoring the Fund to see, among other things, whether it was complying with its
9  stated investment strategy in its prospectuses, registration statements and statements
10  of additional information, and Fidelity therefore should have detected the materials
11  changes from the concentrated Valeant position.

12      **C.**    **Valeant Was an Excessively Risky Investment**

13      73.    Valeant, which is a Canadian healthcare company, develops,
14  manufactures, and markets a range of branded, generic, and branded generic
15  pharmaceuticals, over-the-counter products, and other medical products.  The
16  company operates in the Pharmaceutical Preparations Industry (Standard Industrial
17  Classification 2834), which is its primary business.

18      74.    Valeant states that a "critical element" of its strategy is "business
19  development" through acquisitions.  In that regard, Valeant is a serial acquirer,
20  purchasing products and business and then drastically slashing research and
21  development costs to boost profits.  Within the past five years, Valeant completed
22  more than $30 billion in deals, including the purchases of Bausch & Lomb Inc. in
23  2013 and Salix Pharmaceuticals, Ltd. in 2015.

24      75.    Valeant's flurry of international acquisitions have resulted in repeated
25  restructuring and integrating costs and thus constant changes to Valeant's balance
26  sheets and earnings reports.  Additionally, Valeant's strategy of implementing
27  stratospheric price increases for its life-saving drugs has attracted strong public
28  condemnation, investigations, and scathing media reports. As Sequoia Adviser

KNLH\1492562.1          17

conceded in an October 28, 2015 letter to Sequoia Fund shareholders, Valeant chief executive, J. Michael Pearson, "has been aggressive every step of the way and has attracted equally aggressive critics."

76.    Valeant's books are far more opaque than those of its peers. As an analyst for a leading industry publication commented to the *Wall Street Journal*: "The very big problem about Valeant is that it's a trust-me *story*." Rapoport, M. and Hoffman, L. Schwartz, 1.(2015, December 16). Valeant's Unconventional Books. The Wall Street Journal, pp. BI-B2. Valeant uses an earnings measure, "cash earnings per share," that shows far greater income than those it also reports under standard accounting rules intended to help investors compare companies. Valeant's accounting stands out for its heavy use of tailored earnings metrics that strip out a wide range of expenses, including deal making and acquisition costs, research and development costs, inventory adjustments, and stock payments to employees. The consistency of those expenses suggests they are core to Valeant's business, and not the one-time or unpredictable items that companies often exclude from adjusted figures. Furthermore, the description of the expenses is far too general for a security analyst to gauge the effect on future earnings.

77.    According to an article in the *Wall Street Journal*, data shows a remarkably wide gap between Valeant's GAAP earnings and its cash earnings figure. Under GAAP, the company posted $70 million in net income for the first nine months of 2015. Under its own cash-earnings measure, the company reported a profit of $2.7 *billion*. Strip-outs accounted for 97% of Valeant's adjusted income over the first three quarters of 2015, compared with 35% for the median of Valeant's self-selected peer group. Similarly, in 2013 and 2014, the reported cash earnings were, respectively, about $3 billion and $2 billion more than GAAP earnings. http://www.wsj.com/articles/valeant-an-accounting-pioneer-too-1450202504.

78.    The Sequoia Fund's major investment in Valeant, with its unconventional business model and non-traditional financial statements and metrics, is diametrically opposed to the Fund's investment policy, set forth in its Prospectus, that each investment is extensively studied to appraise fundamental value. Valeant's unconventional, opaque financial statements should have been giant red flags inasmuch as they make it virtually impossible to get a clear view of the fundamental value of Valeant.

79.    Valeant's controversial business practices and opaque financial statements led, ultimately, to a substantial fall in its stock price, which began near the end of September 2015. However, serious questions about the sustainability of Valeant's business model were previously raised by several financial analysts, journalists, and industry insiders well before Valeant's precipitous decline began.

80.    In March 2014, Jim Grant, the editor of an investment journal, criticized Valeant for its notable lack of concern for research and development. *See* http://www.reuters.com/article/valeant-timeline-idUSL2N16T1SQ. And a couple of months later, in May 2014, Bronte Capital's John Hempton publicized that his fund was shorting Valeant, calling its accounting "difficult to comprehend."

81.    On May 15, 2014, hedge fund billionaire Jim Chanos added his voice to the chorus of skeptics when he announced that he was short Valeant, saying the company played "aggressive accounting games." Chanos criticized Valeant's acquisition strategy, noting the pitfalls and potential accounting issues associated with relying on deals for long-term growth. *See* http://blogs.wsj.com/moneybeat/2014/05/15/why-james-chanos-is-short-valeant-long-allergan.

82.    Morgan Stanley, which was an adviser to Valeant in its failed $53 billion hostile bid for Allergan Inc. ("Allergan"), had initially submitted a proposal to Allergan in connection with its defense of the hostile takeover by Valeant.    In June 2014, Allergan released emails from Morgan Stanley banker Robert Kindler in which he referred to Valeant as a "house of cards." Valeant CEO

1  Pearson later tried to shrug off the embarrassing incident, but he acknowledged that
2  Kindler is one of the most highly respected mergers and acquisitions bankers in the
3  industry.        *See*        http://www.reuters.com/article/us-allergan-morganstanley-
4  idUSKBN0ER1L120140616.

5      83.   In February 2015, Valeant purchased a portfolio of older branded
6  drugs. Once acquired, it dramatically increased prices on the entire portfolio. Two
7  of the drugs, Nitropress and Isuprel, were important cardiac medicines used by
8  hospitals during heart surgery. The same day that it purchased the two heart drugs,
9  Valeant increased prices for these drugs from about $257.80 to $805.61 and from
10  about $215.46 to $1,346.62, respectively (increases of 212% and 525%). This
11  prompted a harsh reaction from politicians, health care payers, hospitals and the
12  general public, leaving the impression that the Valeant business is driven primarily
13  by acquisitions and temporary, but unsustainable, price increases.

14      84.   Perhaps the most excoriating early public criticism of Valeant came
15  from Berkshire Hathaway's Charlie Munger. Mr. Munger, Warren Buffett's closest
16  colleague, compared Valeant to ITT, one of the most notorious Wall Street deal-
17  making conglomerates, reflecting Mr. Munger's negative view of Valeant.

18      85.   Over a period of nine years, ITT made more than 350 acquisitions in
19  over 80 countries around the world. Sales exploded from $765 million in 1961 to
20  over $17 billion in 1970 before the wheels started to come off. The ITT empire was
21  ultimately shown to be little more than an accounting trick that covered up the losses
22  from one acquisition with the paper profits of the next one.

23      86.   On March 26, 2015, when asked about Valeant at an investor meeting
24  for the Daily Journal Company, Mr. Munger pulled no punches: "Valeant is like ITT
25  and Harold Geneen [ITT"s former chief executive officer] come back to life, only
26  the guy is worse this time." Mr. Munger was referring to Valeant CEO Pearson,
27  who had rapidly built Valeant into a $90 billion pharmaceutical conglomerate,
28  despite not having developed a single breakthrough drug during his tenure.

1    Mr. Munger attributed Valeant's rapid success to aggressive, unsustainable deal-
2    making, in which the company took on debt and jacked up drug prices to turn fast
3    profits, drawing the comparison to ITT.

4          87.    Valeant temporarily withstood the maelstrom surrounding its brash
5    practices and shaky business model.  In August 2015, Valeant stock reached a
6    closing high of $262, and shares were trading at a remarkable 98 times 2014 GAAP
7    earnings. At the time, about 32% of the Sequoia Fund's net assets and about 35% of
8    its stock holdings were invested in Valeant.  Such an extraordinarily concentrated
9    position in any single issuer would be risky; but with regard to Valeant, a brazen
10   company with murky financials that was continually immersed in controversy, the
11   position was reckless, particularly in view of the Sequoia Fund's stated investment
12   policies.

13         88.    The Sequoia Fund's concentrated position in Valeant was contrary to
14   its investment principle that the Fund "typically sells the equity security of a
15   company when the company shows deteriorating fundamentals, its earnings progress
16   falls short of the investment adviser's expectations or its valuation appears excessive
17   relative to its expected future earnings." With Valeant shares trading at close to 100
18   times the previous year's GAAP earnings, the Sell Strategy and prudent investment
19   judgment required the Fund to sell, or at least trim, its Valeant position.

20         89.    In addition, the Fund's Valeant position resulted in a violation of the
21   Fund's mandatory Concentration Policy, which prohibits the Fund from investing
22   25% or more of the value of the total assets of the Fund in any industry.  The Fund's
23   Valeant holdings alone exceeded 25% of its net assets at the close of the quarters
24   ended March 31, 2015 and June 30, 2015.  In addition, on September 30, 2015, the
25   Fund's investment in "Healthcare" stocks constituted over 25% of its net assets, due
26   principally to the Fund's heavily concentrated position in Valeant (which the Fund
27   classified as a "Healthcare" stock).

28

90. Specifically, the Fund held stock in the following percentages that violated the mandatory Concentration Policy: (1) on March 31, 2015, the Fund held 27.3% of its net assets in "Healthcare" stocks, with Valeant alone composing 26% of the Fund's net assets; (2) on June 30,2015, the Fund held 30% of its net assets in "Healthcare" stocks, with Valeant alone composing 28.7% of the Fund's net assets; and (3) on September 30, 2015, the Fund held 26% of its net assets were held in "Healthcare" stocks, with Valeant alone composing 24.8% of the Fund's net assets.

91. As Larry E. Swedroe, a highly regarded financial commentator, stated: "There's no way Valeant could be considered a value stock...Not at 100 times forward earnings. If they were a systematic value manager that followed certain statistical criteria, they would never have owned Valeant at that multiple, let alone let it get to nearly one-third of the portfolio." *See* http://www.nytimes.com/ 2015/11/13/business/huge-valeant-stake-exposes-rift-at-sequoia-fund.html?_r=0.

## D.   Valeant's Collapse Leads to the Fund's Collapse

92. Following the stock's peak in August 2015, Valeant was impacted by a series of negative events that preceded its substantial decline beginning in September 2015. The collapse in Valeant's stock price was highly foreseeable to any prudent fiduciary based on its business practices and the growing chorus of negative public comments.

93. On August 14, 2015, Senator Bernie Sanders and Congressman Elijah Cummings requested information on why Valeant aggressively raised the price of the two heart drugs. *See* http://fortune.com/2015/10/311valeant-scandal.

94. Andrew Left of the short-selling firm Citron Research then published a report on Valeant in September 2015, citing evidence of huge drug-price hikes. According to Left, Valeant's model is something any person off the street can replicate—"jack up prices and cut spending." While the company claimed that it needs to raise the prices of its drugs in order to fund research and development ("R&D"), Left pointed out that Valeant spends only 3% on R&D, compared to the

1  industry average of 17%.  *See* http://v.rww.businessinsider.com/citron-valeant-
2  report-2015-9.

3      95.  Adding to the controversy, Democrats on the U.S. House of
4  Representatives Oversight and Government Reform Committee signed a letter,
5  dated September 28, 2015, that was sent to the chairman, Rep. Jason Chaffetz (R-
6  Utah), asking him to subpoena Valeant. The letter requested information about the
7  "massive price increases" on two of Valeant's drugs used to treat heart conditions.
8  *See* http://fortune.com/2015/JO/31/valeant-scandal.  And recently, Senator Susan
9  Collins, Republican of Maine, criticized Valeant at a hearing of the Senate's Special
10  Committee on Aging, which she chairs. Referring to Valeant and another company
11  with overnight price increases for decades-old drugs, Senator Collins stated: "These
12  companies are to ethical pharmaceutical companies as a loan shark is to a bank." *See*
13  http://www.nytimes.com/20            15/12/1O/business/senators-condemn-big-price-
14  increases-fordrugs.html?_r=O.

15      96.  An October 5, 2015 study by a Deutsche Bank analyst concluded that
16  Valeant jacked up prices on 54 medications in 2015 alone by an average of 66%, far
17  more than the rest of the drug industry, which averages about 5% per year. Valeant
18  later disclosed, on October 15, 2015, that it had received at least two subpoenas
19  regarding its drug-pricing strategy.

20      97.  Citron Research released another report, on October 21, 2015, this time
21  highlighting Valeant's mysterious relationship with Philidor, a pharmacy that
22  distributes drugs for specialty pharmacies, which Valeant had the option to
23  purchase. In that report, Citron Research insinuated that Valeant was involved in
24  deceptive       accounting       practices       involving       Philidor.       *See*
25  http://www.businessinsider.com/a-short-selling-firm-is-accusing-valeant-of-being-
26  enron-andit-says-it-has-proof-2015-10.

27      98.  During the three-day period from October 20 to October 22, 2015,
28  Valeant's stock price fell 30%. Valeant investor William Ackman held a conference

1  call on October 30, 2015 in an effort to stop the downward spiral, but following the
2  call, the stock fell another 16%.

3     99.  On October 25, 2015, two of the Sequoia Fund's four independent
4  directors, Vinod Ahooja and Sharon Osberg, abruptly resigned, in a rare and public
5  sign of dissent within a mutual fund's board. The resignations came just days after
6  a contentious board meeting in which the Fund's managers Poppe and Goldfarb
7  revealed that the Sequoia Fund had purchased still more shares of Valeant. It was
8  reported that all of the Sequoia Fund's independent directors had repeatedly
9  expressed concern over the size of the already large stake in Valeant. A few days
10 after Poppe and Goldfarb disclosed the purchase of an additional 1.5 million shares,
11 Ahooja and Osberg resigned at almost exactly the same time. *See*
12 http://www.nytimes.com/2015/11/13/business/huge-valeant-stake-exposes-rift-at-
13 sequoiafund.html?r=O.

14    100.  After the resignations, Poppe stated that there had been an ongoing
15 debate for a considerable period of time over the Fund's outsized concentration in
16 Valeant. Osberg had been expressing her worries about Valeant at board meetings
17 for over a year, and she grew so concerned that she insisted the discussions be
18 reflected in the minutes. Former Valeant supporter Warren Buffett advised Osberg
19 on her predicament and agreed with her decision to resign after concluding she had
20 done all she could as a board member to steer the company away from its Valeant
21 position.

22    101.  Undaunted by the tidal wave of criticism and recent director
23 resignations, Sequoia Adviser sent a letter to the Fund shareholders, in which it
24 tried, unpersuasively, to rationalize its reckless investment in Valeant:

25         We work hard to understand Valeant and its business
           model. Our belief has always been    that Pearson is
26         honest and extremely driven. He does everything legally
           permissible to      maximize Valeant's earnings. One
27         lesson of recent events is that sometimes doing everything
           legally permissible to maximize earnings does not create
28         shareholder value. All    enduring businesses must strive

24

1

2

3

> to earn and maintain a good reputation. Because of its large indebtedness and need to tap the capital markets to make acquisitions, Valeant in particular needs the confidence of the credit market to execute its business model.

4   102.   From Valeant's August peak through November 17, 2015, it lost over

5  $65 billion, which is nearly 75% of its market value, as Valeant stock declined from

6  over $263 to under $70 per share.

7   103.   During the same time period, the Sequoia Fund lost well over $2 billion

8  in value due to Valeant's price decline, or about 25% its value. At the start of the

9  Class Period, the Fund closed at $253, and at the close of the Class Period, it closed

10 at $192.

11   104.   According to a Morningstar report that was published in the financial

12 section of the *New York Times* on November 19, 2015, out of 1,265 large

13 capitalization stock mutual funds, the Sequoia Fund was ranked number 1,258

14 (seventh from the bottom) based on its one-year performance. The Fund's dismal

15 ranking was entirely due to Valeant's stock decline.

16   105.   This loss by the Sequoia Fund was highly foreseeable. It held a hugely

17 concentrated position in a highly overvalued Valeant stock that was trading at

18 ridiculously inflated prices, far beyond rational fundamentals.   Moreover, the

19 growing negative press and scrutiny of Valeant and its business model made it

20 highly foreseeable that its stock price would crash along with that of the Sequoia

21 Fund.

22   106.   In addition to the Sequoia Fund's concentration in Valeant, its adviser,

23 Sequoia Adviser, also managed separate accounts for investors and beneficially

24 owned close to 36 million shares of Valeant, or over 10% of the outstanding

25 common shares.   As a result, Sequoia Adviser was highly conflicted as sales of

26 Valeant stock by the Fund would potentially depress the price of any remaining

27 Valeant shares held by Sequoia Adviser in managed accounts, and jeopardize its

28 compensation.

**E.   The Plan Fiduciaries' Failure to Monitor and Act**

107.   Throughout the Class Period, Fidelity had fiduciary duties to monitor the investment options under the Plan for prudence and appropriateness as an investment for retirement savings.   This required that Fidelity conduct regular reviews of the Plan's investment options, as well as research and due diligence on the investments themselves.

108.   At a minimum, Fidelity had ongoing duties to monitor and ensure that the Sequoia Fund was adhering to its own stated investment strategies in its prospectuses, registration statements and statements of additional information, and that it was adhering to its investment style as a value-oriented, large cap fund, as this was how it was characterized to Plan participants as an investment option.

109.   Had Fidelity engaged in proper monitoring and review of the Sequoia Fund, it would have recognized its imprudence as an investment.   Fidelity should have known and understood that: 1) the Sequoia Fund was concentrated in Valeant at levels which exceeded its maximum limits under the Concentration Policy; 2) Valeant was trading at prices which far exceeded its fundamentals, at time 100 times its 2014 GAAP earnings; 3) the Fund's Valeant position violated its Sell Strategy; 4) Valeant lacked transparency and engaged in risky accounting practices; 5) Valeant's business practices expose it to huge regulatory risk; 6) Valeant's practices were under ever-increasing negative scrutiny and criticism; and 7) the Sequoia Fund's quality and risk level had fundamentally changed because of its speculative concentration in Valeant.

110.   For these reasons, the Sequoia Fund was an imprudent investment during the Class Period.   The Fund invested in violation of its stated strategy and policies, was no longer a value-oriented fund but a speculative fund, and was no longer an appropriate vehicle for the investment of retirement savings.   With minimum review and diligence on the Sequoia Fund, Fidelity would have known and detected that it was imprudent.

111. Notwithstanding what it knew or should have known, Fidelity, in fact, did nothing in response to the material changes at the Sequoia Fund to protect the retirement savings of the Plan participants to whom they owed their fiduciary duties. There were numerous actions Fidelity could have taken to prevent foreseeable harm to the Plan and Plan participants, but it did nothing.

112. First, Fidelity had the power to prevent Plan participants from buying the Sequoia Fund by suspending or closing it to new investments. This action was absolutely required as soon as the Sequoia Fund violated its Concentration Policy in its prospectuses, registration statements and statement of additional information which was plain as of March 31, 2015, and every quarter thereafter when the Fund reported its positions.

113. Second, Fidelity had the power and duty to divest the Plan of its Sequoia Fund holdings as soon as it became imprudent. Plan participants had invested in the Sequoia Fund seeking a value-oriented large cap fund. There are numerous other value-oriented, large cap funds which are publicly available to investors, including several already available through the Plan itself. Fidelity could have mandated the transfer from the Sequoia Fund into another value-oriented fund. The substitution of one similar fund for another is not an unusual occurrence for defined contribution retirement plans, and protects Plan participants without harming the Plan.

114. Third, Fidelity had the power and duty to disclose and communicate the material adverse changes in the Sequoia Fund to the Plan participants which made it an imprudent investment. Fidelity had the duty to disclose material changes which had occurred, including that the Fund had violated its Sell Strategy and Concentration Policy in its governing documents, and that it was engaged in a risky and speculative strategy which was no longer a value-oriented strategy. At a minimum, Fidelity needed to disclose that the Sequoia Fund's strategy and risk level had changed, and that it was no longer a prudent investment for retirement funds. It

1  needed to make these disclosures because the Plan participants did not
2  independently seek out the Sequoia Fund but invested in reliance on the screening,
3  selection and offering of this Fund through the Plan.

4      115. Fidelity also could have recommended to the Committee taking any of
5  these actions—closing the Fund, divesting the Plan of its Fund investments, and/or
6  disclosing to Plan participants the change in fundamental risk level that the Fund
7  had undergone.

8      116. As fiduciaries responsible for monitoring and overseeing Fidelity, the
9  Committee Defendants could have and should have taken action when they learned
10 from Fidelity that the Sequoia Fund had fundamentally deviated from its investment
11 strategy, blown through its concentration limits, and become a high-risk, speculative
12 investment.   At the very least, the Committee fiduciaries—all senior Disney
13 executives with a sufficiently sophisticated background and experience to evaluate
14 an investment option like the Sequoia Fund—should have recognized based on the
15 reporting they received from Fidelity that the Fund had become imprudent, and if
16 Fidelity was unable or unwilling to act based on that change, then the Committee
17 should have used its powers to force Fidelity to act, either by changing the
18 "investment objectives" by which Fidelity had to abide, or by removing or replacing
19 Fidelity as fiduciary if necessary.

20     117. In sum, defendants breached their fiduciary obligations to Plan
21 participants.  They allowed their fiduciary wards to purchase and hold the Sequoia
22 Fund after it had become an imprudent investment during the Class Period that was
23 heading toward a foreseeable price crash.  Plan participants thus were prevented
24 from being able to invest in an alternative, prudent investment that would not have
25 caused them the same losses during the Class Period.  Millions upon millions of
26 dollars were lost from the retirement accounts of Disney employees. Defendants are
27 directly responsible for this enormous harm that their breaches of duty caused.

28

## 4. CLASS ACTION ALLEGATIONS

118. Plaintiffs bring this action as a class action pursuant to Federal Rule of Procedure 23(a), (b)(1) and/or (b)(2) on behalf of themselves and the following class of persons similarly situated (the "Class"):

> All individuals, excluding defendants, who participated in the Plan and whose individual accounts purchased and/or held the Sequoia Fund at any time between March 31, 2015, to the present, inclusive.

119. Excluded from the Class are the defendant, its officers and directors, members of defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

120. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are at least 50,000 members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Disney or the Plan and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

121. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

122. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. Whether defendants owed a fiduciary duty to the Plan, to plaintiffs and to members of the Class;

b.   Whether defendants breached fiduciary duties owed to the Plan, plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and beneficiaries;

c.   Whether defendants violated ERISA; and

d.   The extent to which Class members have sustained damages and the proper measure of those damages.

123.   Plaintiffs' claims are typical of the claims of the members of the Class because plaintiffs and the other members of the Class each sustained damages or were negatively affected by defendants' wrongful conduct in violation of ERISA as complained of herein.

124.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel highly competent and experienced in class action and complex litigation, including actions involving ERISA plans.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

125.   Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because this action is also brought on behalf of the Plan, and any prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to the Plan which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

126.   Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for defendants; and (ii) defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class as a whole.

127. Plaintiffs also bring this action on behalf of the Plan pursuant to ERISA §§ 409(a), 502(a)(2), 29 U.S.C. §§ 1109(a), 1132(a)(2).

**COUNT I**
**Failure to Prudently and Loyally Manage the Plan's Assets**
**(Against Defendant Fidelity)**

128. Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

129. At all relevant times, as alleged above, defendant Fidelity was a plan fiduciary within the meaning of ERISA § 3(21)(a), 29 U.S.C. § 1002(21)(A) in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

130. Under ERISA, all fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that all investments in the Plan were prudent and that such investment was consistent with the purpose of the Plan. Defendant is liable for losses incurred as a result of such investments being imprudent.

131. A fiduciary's duty of prudence requires it to disregard plan documents or directives that it knows or reasonably should have known would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(l)(D), 29 U.S.C. § 1104(a)(l)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plans, to do so.

132. Defendant Fidelity breached its duties to prudently manage the Plan's assets. During the Class Period, Fidelity knew that the Sequoia Fund had become an imprudent investment for Plan participants' retirement savings because: 1) the

1  Sequoia Fund was concentrated in Valeant at levels which exceeded its maximum
2  limits under the Concentration Policy; 2) Valeant was trading at prices which far
3  exceeded its fundamentals, at times as much as 100 times its 2014 GAAP earnings;
4  3) the Fund's Valeant position violated its Sell Strategy; 4) Valeant lacked
5  transparency and engaged in risky accounting practices; 5) Valeant's business
6  practices expose it to huge regulatory risk; 6) Valeant's practices were under ever
7  increasing negative scrutiny and criticism; and 7) the Sequoia Fund's quality and
8  risk level had changed from its speculative concentration in Valeant.

9      133. Accordingly, defendant Fidelity should have taken appropriate
10  responsive action by restricting transactions or new investments by the Plan in the
11  Sequoia Fund, by mandatorily divesting the Plan into another value-oriented fund or
12  by effectuating disclosures that would have warned and alerted Plan participants
13  about the material change in the Fund's risk level and prudence as an investment.
14  Alternatively, Fidelity could have recommended to the Committee that these actions
15  be taken to protect Plan participants.

16      134. During the Class Period, Plan participants could not appreciate the true
17  risks presented by investments the Sequoia Fund and, therefore, could not make
18  informed decisions regarding their investments.

19      135. As a direct and proximate result of the breaches of fiduciary duties
20  alleged herein, the Plan, and indirectly plaintiffs and other Plan participants,
21  suffered foreseeable damage to and/or lost a significant portion of their retirement
22  investments. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409,
23  29 U.S.C. § 1109(a), defendant Fidelity is liable to restore the losses to the Plan
24  caused by its breaches of fiduciary duties.

25
**COUNT II**
**Failure to Monitor**
26  **(Against the Committee and the Committee Defendants)**

27      136. Plaintiffs incorporate the allegations contained in the previous
28  paragraphs of this Complaint as if fully set forth herein.

137. At all relevant times, as alleged above, the Committee and the Committee Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

138. At all relevant times, as alleged above, the scope of the fiduciary responsibility of the Committee and the Committee Defendants included the responsibility to appoint, evaluate, and monitor other Plan fiduciaries, including, but not limited to, Fidelity.

139. The Committee and the Committee Defendants breached their fiduciary monitoring duties during the Class Period when the fiduciary they were tasked with monitoring, Fidelity, failed to take action to protect Plan participants from the inevitable harm that would be caused them by the Sequoia Fund's high level of risk, overconcentration in Valeant, and lack of compliance with its governing documents regarding concentration and investment strategy. The Committee and the Committee Defendants should have recognized, based on the reporting regarding the Sequoia Fund that they received from Fidelity, that the Fund had become an imprudent investor for their fiduciary wards. The Committee and the Committee Defendants could have advised Fidelity to follow new "investment objectives" that would include closing the Sequoia Fund, divesting the Plan of Sequoia Fund holdings, and/or disclosing the imprudence of the Sequoia Fund to Plan participants; they could have recommended that Fidelity take one or more of those actions, and if Fidelity failed to do so, they could have removed or replaced Fidelity from its fiduciary role. The failure of the Committee and the Committee Defendants to take any of these actions constituted a breach of their fiduciary duties.

140. As a direct and proximate result of these breaches of fiduciary duties alleged herein, the Plan, and indirectly plaintiff and other Plan participants, suffered foreseeable damage to and/or lost a significant portion of their retirement investments. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409,

1  29 U.S.C. § 1109(a), the Committee and the Committee Defendants are liable to
2  restore the losses to the Plan caused by their breaches of fiduciary duties.

3                              **PRAYER FOR RELIEF**

4  WHEREFORE, plaintiffs pray for:

5          A.      Determination that the instant action may be maintained as a
6  class action under Rule 23, Federal Rules of Civil Procedure, appointing plaintiffs as
7  class representatives, and determining that plaintiffs' counsel satisfies the
8  prerequisites of Rule 23(g);

9          B.      Declaration that defendants breached ERISA fiduciary duties
10 owed to the Plan and its participants;

11         C.      An Order compelling defendants to make good to the Plan all
12 losses to the Plan resulting from defendants' breaches of their fiduciary duties,
13 including losses to the Plan resulting from imprudent investment of the Plan's
14 assets, and to restore to the Plan all profits any defendant made through use of the
15 Plan's assets, and to restore to the Plan all profits which the participants would have
16 made if defendants had fulfilled their fiduciary obligations;

17         D.      Imposition of a Constructive Trust on any amounts by which
18 defendants were unjustly enriched at the expense of the Plan as the result of
19 breaches of fiduciary duty;

20         E.      An Order enjoining defendants from any further violations of
21 their ERISA fiduciary obligations;

22         F.      Actual damages in the amount of any losses the Plan suffered, to
23 be allocated among the participants' individual accounts in proportion to the
24 accounts' losses, including the lost opportunity costs;

25         G.      An Order that defendants allocate the Plan's recovery to the
26 accounts of all participants who had any portion of their account balances invested
27 in the Sequoia Fund in proportion to the accounts' losses attributable to the decline
28 in the price and/or the value of investment in alternative options under the Plan;

1  II.  Awarding the Plan and/or Plan participants rescission and/or

2  money damages, including pre-judgment interest;

3  I.  An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

4  J.  An Order awarding attorneys' fees pursuant to 29 U.S.C.

5  § 1132(g) and the common fund doctrine;

6  K.  An Order for equitable restitution and other appropriate equitable

7  monetary relief against defendants; and

8  L.  Such other and further relief the Court deems just and equitable.

9  **DEMAND FOR JURY TRIAL**

10  Plaintiffs and the Class request a jury trial for any and all Counts for which a

11  trial by jury is permitted by law.

12

13  By:  /s/ Michael L. Kirby

14  Michael L. Kirby

15  **KIRBY NOONAN LANCE & HOGE LLP**

16  350 Tenth Avenue, Suite 1300
   San Diego, CA 92101-8700

17  Telephone: 619/231-8666
   Facsimile: 619/231-9593

18  *MKirby@knlh.com*

19  Samuel E. Bondcroff (*pending pro hac vice*)
   Jacob H. Zamansky (*pending pro hac vice*)

20  Edward H. Glenn Jr. (*pending pro hac vice*)

21  **ZAMANSKY LLC**
   50 Broadway, 32nd Floor

22  New York, NY 10004

23  Telephone: (212) 742-1414
   Facsimile: (212) 742-1177

24  *samuel@zamansky.com*

25

26  ATTORNEYS FOR PLAINTIFFS

27

28